GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
DHAIVAT H. SHAH, ESQ. (SBN 196382)
(ds@grellas.com)
JUSTIN L. SOWA, ESQ. (SBN 305002)
(jsowa@grellas.com)
550 California Street, Suite 1040
San Francisco, CA 94104
Telephone: (408) 255-6310
Facsimile: (408) 255-6350

Attorneys for Plaintiff
MAHESH TOURANI

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

MAHESH TOURANI,

Plaintiff,

v.

YASHIN MANRAJ; MACY WILSON; PVOTAL TECHNOLOGIES, INC., a Delaware corporation; and DOES 1 through 20,

Defendants.

**Case No.**

**COMPLAINT FOR:**

(1) Exchange Act § 10(b) and Rule 10b-5; (2) Exchange Act § 20(a); (3) Cal. Corp. Code §§ 25401, 25501, 25504, 25504.1; (4) Or. Rev. Stat. § 59.115; (5) Intentional Misrepresentation; (6) False Promise; (7) Fraudulent Concealment; (8) Negligent Misrepresentation; (9) Rescission and Restitution; (10) Cal. Penal Code § 496; (11) Voidable Transfers; (12) Constructive Trust and Equitable Lien; (13) Accounting; (14) Declaratory Relief

**DEMAND FOR JURY TRIAL**

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

Plaintiff Mahesh Tourani alleges as follows:

## I. NATURE OF THE ACTION

1. Between November 2021 and August 2026, Mahesh Tourani paid $12,082,252 for stock in Pvotal Technologies, Inc. ("Pvotal" or the "Company"), a Delaware software company run by its co-founder and Chief Executive Officer, defendant Yashin Manraj. He paid it on the strength of what Mr. Manraj told him about Pvotal, and what Mr. Manraj told him was false.

2. Mr. Manraj told Mr. Tourani that he had built proprietary technology that would replace the architecture on which most of the world's software runs. He told him that Pvotal's product, Infrastream, was launching globally with Google, that Google had made an offer for part of the business, that outside investors were waiting to buy in at valuations far above what Mr. Tourani was paying, and that the Company's value had multiplied, so that shares for which Mr. Tourani first paid 37.5 cents were worth $12.85 apiece. He promised that a board, with Mr. Tourani on it, would control the Company's finances. And he told Mr. Tourani, again and again, that each new payment was needed for Pvotal's operations and payroll.

3. Pvotal had a board only on paper. Its three directors, Mr. Manraj, Ashley Manraj, and defendant Macy Wilson, never met as a board, and Mr. Tourani never received the seat he was promised. On information and belief, Google never made an offer, and no outside investor ever paid a price near the valuations Mr. Manraj quoted. Over its entire life, Pvotal took in $1,637,163.63 from customers. In September 2026, a technology valuation expert conducted an independent financial review of Pvotal's technology and valuation and found that Infrastream had earned no product revenue and, as it stood, Pvotal was worth somewhere between $15,000 and $200,000.

4. Pvotal was a real company, with real engineers and a real product. But from the start, Mr. Manraj leveraged the actual company to support his outlandish claims to raise funds that he used largely to enrich himself. The very day after Mr. Tourani's first payment arrived, Pvotal began paying a payee saved as "Boacorp," a Bank of America account from which Mr. Manraj's personal credit cards are paid. Mr. Tourani's payments supplied about three of every

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

four dollars that ever entered Pvotal's operating account. From that account, Mr. Manraj caused Pvotal to make payments of which Pvotal's operational management had no knowledge and for which its records show no business purpose, including $789,580.09 to "Boacorp"; $130,752.35 (above what he was paid through Pvotal payroll) to his own account outside Pvotal's payroll system and $79,000 to Ms. Wilson's; $582,016.39 to "Mckinsey," although Pvotal has no record of any McKinsey engagement; $419,982.34 to "Regence" for a health plan that, according to Pvotal's benefits broker, covered only Mr. Manraj and his spouse, Ms. Wilson, at no more than about $1,200 a month; and $150,000 to "William." Upon information and belief, Mr. Manraj controlled each of these accounts and used these funds for his own benefit. Pvotal's money also paid American Express bills that carried household charges, among them charges that, on information and belief, were for surveying and electrical work at the Chico, California horse property Ms. Wilson bought in late 2023.

5. In October 2025, having told Mr. Tourani's family office that Pvotal was moving from Delaware to Nevada, Mr. Manraj gave it wiring instructions for a Columbia Bank account titled "Pvotal Tech," at a Las Vegas address, that Pvotal's operating team has never been able to access. At his direction, the payments made for Mr. Tourani's account in 2026, $1,366,752 in eight wires through August, went there. The account forwarded $1,201,963.67 to Pvotal, and the wire descriptions for $412,603.44 of it called the money a loan. In June and July 2026, while Pvotal missed payroll, the account paid $104,362.28 to an American Express account that included his personal charges and $39,645.75 to Pvotal.

6. On August 13, 2026, after Mr. Tourani's representatives and Pvotal's operating team asked for financial records, Mr. Manraj sent the team 75 files. Three were American Express statements that had been edited minutes before he sent them. The edits replaced Ms. Wilson's name with "PVOTAL TECH" and changed merchant descriptions, so that a land surveyor's charge appeared as Google Workspace, an electrical contractor's as "LAWPAY," and a veterinary hospital's as "AIRPORT DCW." Mr. Manraj has not communicated with Mr. Tourani or with Pvotal's operating team since. Pvotal has laid off its employees and closed.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

7. Mr. Tourani sues to rescind his purchases and recover what he paid, and for damages, under the Securities Exchange Act of 1934, the securities laws of California and Oregon, and California law. He is applying concurrently for a temporary restraining order that would preserve the Chico property and the identified accounts to the extent of the money traced from his payments, require Mr. Manraj to identify the accounts that received it, and permit expedited discovery from the banks that hold the records.

## II. THE PARTIES

8. Plaintiff Mahesh Tourani resides in Dubai, United Arab Emirates. He is a citizen of India and a permanent resident of United Arab Emirates and is neither a citizen nor a lawful permanent resident of the United States. Pvotal's stock ledger credits him with 9,078,330 paid shares, about one-third of the 27,549,133 shares the Company has reported as outstanding.

9. Mr. Tourani paid for his shares from his own accounts and from accounts of members of his family, principally his son, Rohan Tourani, alone or jointly with Mr. Tourani's mother, Ishwari Tourani, or with Mr. Tourani, and on one occasion from the account of a family friend. Each transfer was made for Mr. Tourani's account, Mr. Manraj accepted it as such, and Pvotal's records attribute the resulting shares to him.

10. Defendant Yashin Manraj, also known as Yashin D. Manraj and Yashin Dev Manraj, resides, on information and belief, at 2958 Chico Avenue, Chico, Butte County, California. He co-founded Pvotal and has been its Chief Executive Officer at all relevant times. On information and belief, he is a citizen of the United States domiciled in California.

11. Defendant Macy Wilson, also known as Macy L. Wilson and Macy Linn Wilson, resides with Mr. Manraj at 2958 Chico Avenue (the "Chico Property"), which she purchased in late 2023. On information and belief, she is Mr. Manraj's spouse. On information and belief, she is a citizen of the United States domiciled in California. Pvotal's incorporator appointed her one of its three initial directors, and on information and belief she remains a director. Pvotal's shareholder lists show her holding 350,000 Pvotal shares in June 2023, 500,000 in March 2025, and 829,365 in September 2025.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

12. Defendant Pvotal Technologies, Inc. is a Delaware corporation with its principal place of business in Chico, California. Pvotal sold Mr. Tourani the shares at issue and received the money he paid for them, except the money Mr. Manraj diverted to the Columbia Account described below.

13. Mr. Tourani does not know the true names or capacities of the defendants sued as Does 1 through 20, inclusive, and therefore sues them by those fictitious names. Mr. Tourani will amend this Complaint to allege their true names and capacities when they are ascertained. On information and belief, each Doe defendant is responsible in some manner for the events and harms alleged in this Complaint, participated in or received the benefit of the conduct alleged. On information and belief, each Doe defendant is a citizen of a State of the United States.

## III. JURISDICTION AND VENUE

14. The Court has subject-matter jurisdiction over the First and Second Counts under 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa. Those claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

15. The Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a). All of them arise from the same course of conduct as the federal claims: Mr. Manraj's solicitation of Mr. Tourani's investment in Pvotal and what became of the money.

16. The Court also has jurisdiction under 28 U.S.C. § 1332(a)(2). Mr. Tourani is a citizen of a foreign state and is not a lawful permanent resident of the United States, each defendant is a citizen of a State, and none is a citizen or subject of a foreign state, Pvotal is a citizen of Delaware and California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. The Court has personal jurisdiction over Mr. Manraj and Ms. Wilson, who are domiciled in California, and over Pvotal, which has its principal place of business here.

18. Venue lies in this District under 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(1) and (2). Each named defendant resides in Butte County: Mr. Manraj and Ms. Wilson live there,

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

and Pvotal has its principal place of business there. On information and belief, Mr. Manraj made the 2024 through 2026 solicitations described below from Chico, and he signed the five 2026 purchase agreements described below there. The Chico Property itself is a subject of this action. The action arises in Butte County and belongs in the Sacramento Division. E.D. Cal. L.R. 120(d).

## IV. FACTUAL ALLEGATIONS

### A. Sources of Knowledge of Alleged Facts

19. Mr. Tourani alleges the facts about his own investment and his own dealings with Mr. Manraj on personal knowledge, and all other facts on information and belief formed after investigation by his counsel. The investigation has included review of Pvotal's bank statements for its operating account from June 2021 through July 2026, the Columbia Bank, Bank of America, and American Express statements Mr. Manraj produced on August 13, 2026, and a technical examination of those files, Pvotal's investor files, including its purchase agreements, share certificates, ledgers, and Mr. Manraj's correspondence with Mr. Tourani and with Mr. Tourani's family office in Dubai (the "Family Office"), Pvotal's certificate of incorporation, bylaws, and other corporate records, a September 2026 assessment of Infrastream prepared by an independent valuation expert, the Family Office's emails and WhatsApp messages with Mr. Manraj and with others acting for Pvotal, Pvotal's personnel and payroll records, public records of Butte County and the Butte County Superior Court, and interviews of Pvotal's operating leadership. The records that would answer the remaining questions are held by banks, card issuers, and Mr. Manraj himself.

### B. Pvotal and Its Chief Executive

20. Mr. Manraj incorporated Pvotal in Delaware on June 2, 2021. On June 17, 2021, the Company opened its operating account at JPMorgan Chase Bank, N.A., account ending 9601 (the "Chase Account"). The account's statements were mailed to an address in Eagle Point, Oregon, where on information and belief Mr. Manraj then lived, through February 2024, and to the Chico Property beginning in March 2024.

21. Pvotal's operating leadership team consisted of Elisabeth Beiter (CIO), Emily Ardrey (HR), Mickael Guesnon (Engineering), and Ashley Manraj, a relative of Yashin who served as CTO. Yashin Manraj was apparently predominantly occupied with fundraising, and he interacted with the operating leadership team infrequently.

22. Mr. Tourani dealt with Pvotal through Mr. Manraj. Mr. Manraj communicated with Mr. Tourani directly and through Balraj Sharma, the Family Office's general manager. Until the summer of 2026, Mr. Tourani's only sources of information about Pvotal's finances, technology, and prospects were Mr. Manraj and those who spoke for him. Mr. Tourani had no access to Pvotal's bank records.

23. From May 2023 through early 2025, much of Pvotal's paperwork with the Family Office was handled by Daniel Stoller, who described himself as the son and assistant of Pvotal's lawyer. Mr. Stoller also relayed to the Family Office what Pvotal's shares were worth, what the money was for, and when it was needed. On information and belief, Mr. Stoller acted as Pvotal's agent and at Mr. Manraj's direction, and what he told the Family Office about those matters came from Mr. Manraj.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

## C. The November 2021 Pitch

24. Mr. Tourani was introduced to Mr. Manraj in 2021 by a friend who is Mr. Manraj's first cousin. Mr. Manraj came to Dubai in November 2021 to raise money for Pvotal. He spoke to Mr. Tourani, who agreed to arrange a meeting where Mr. Manraj could pitch his company. On November 8, 2021, Mr. Manraj, Mr. Tourani, Mr. Sharma, and Rohan Tourani met at Mr. Tourani's residence in Dubai.

25. At that meeting, and in conversations that followed, Mr. Manraj told Mr. Tourani that nearly all the world's software ran on an aging architecture known as REST, which he described as slow, expensive to scale, and insecure. He said that he was personally designing and building proprietary technology, based on an architecture called gRPC, that was faster, cheaper to operate, and more secure than anything on the market. He said that the technology would be delivered through an enterprise product, Infrastream, that would first be deployed with a handful of major enterprise customers and then, once they had validated it,

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

displace REST-based systems across the market. He presented Pvotal at a valuation of $7,500,000.

26. The next morning, November 9, 2021, Mr. Manraj followed up by email to the Family Office, addressed to Mr. Sharma. He attached Pvotal's investor presentation (the "Investor Deck"), a draft nondisclosure agreement, wire instructions, and a list of job descriptions.

27. In his November 9 email, Mr. Manraj wrote that Pvotal's lawyer "will then finalize the paperwork within a week or two at most - this will include the NDA, Shareholder Agreement, Pro Rata rights requested, and any other special protections." He wrote that there would be a "first Board Meeting in January of 2022," that "the Board will have ultimate control of financial and other company oversight in the long run," and that he would provide "more information by the end of December for Mahesh's board seat."

28. The Investor Deck made numerous sweeping claims about Pvotal's "transformative" technology, including that Pvotal was "the New Web Standard," and was poised to revolutionize internet security, providing a single product that would replace a whole suite of security software. It stated that Pvotal's technology could replace $600,000 of annual enterprise software subscriptions with one $40,000 product. Pvotal, the presentation claimed, could replace up to 15 separate services with one framework, completely altering cloud infrastructure, computing, and development. Infrastream was presented as cheaper, more efficient, more secure, more flexible, and even less carbon-intensive than market alternatives.

29. The Investor Deck stated, "We are fully compliant with all major standards," and listed among Pvotal's advantages "ISO 27001, 27018, SOC 1-3, HITRUST environments" and "Unbreachable novel microservices." It said that "[n]o current ransomware or hack vectors are effective" against Pvotal's framework, and that Pvotal's goal was "to secure these company certifications for our product in early 2022." It described a "patent-pending, end-to-end Cloud Native framework," projected that Pvotal "can clear $100M ARR by 2026," and credited Mr. Manraj with "3 successful exits."

30. Mr. Tourani read the November 9 email and the Investor Deck and decided to invest based on the representations in the Investor Deck and what Mr. Manraj had told him in the November 8 meeting. That afternoon, in the same email thread, Mr. Tourani told Mr. Sharma to proceed with a $1 million investment in Pvotal, structured as $250,000 a month for four months. Pvotal received the first $250,000 on November 12, 2021.

31. On November 24, 2021, Mr. Manraj wrote to Mr. Tourani directly, copying the Family Office and Rohan Tourani, about steps to be completed "prior to the Board Meeting in January." He told Mr. Tourani that he "will receive a total of 3 million shares with 20 million shares issued," or 15 percent of the Company at the $7,500,000 valuation Mr. Manraj had presented. The same day, in an email to another prospective investor on which Mr. Tourani was copied, Mr. Manraj repeated the governance promises verbatim, including that "the Board will have ultimate control of financial and other company oversight in the long run."

32. There was no board meeting in January 2022, and there has been none since. Mr. Tourani never received a board seat or the promised information about one. Pvotal never delivered a shareholder agreement, a voting agreement, or a pro rata rights agreement. The nondisclosure agreement was not signed until January 5, 2023, nearly fourteen months after Mr. Tourani's first payment.

33. The board existed only on paper. On June 2, 2021, Pvotal's incorporator appointed three initial directors, to serve "until their successors are elected and qualify": Mr. Manraj, Ashley Manraj, and Ms. Wilson. On information and belief, none has been replaced. That board never met and, on information and belief, never acted. On March 20, 2023, telling the Family Office what Mr. Tourani's proxies could sign, Mr. Manraj excepted only "the sale of shares and the company board resolution (we have none so far)." In June 2023, Mr. Manraj signed amended and restated bylaws, which Pvotal also had Mr. Tourani sign, providing that "the Board shall consist of at least five members" and that its chair "shall be an Outside Director." Pvotal never had either.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

34. Believing what Mr. Manraj had told him, Mr. Tourani did more than passively invest. Over the years that followed, he introduced Mr. Manraj to prospective enterprise customers in his own business network and vouched for him to them.

**D. The Purchase Agreements**

35. Pvotal documented the first three rounds of Mr. Tourani's investment in stock purchase agreements naming Pvotal as the company and Mr. Tourani as purchaser, with Mr. Manraj, "Chief Executive Officer," as Pvotal's signatory (the "Purchase Agreements"). The Round 1 agreement is "made as of" November 2021 and closed on November 12, 2021. The Round 2 agreement is dated September 12, 2022, and the Round 3 agreement October 4, 2023.

36. Section 1.4 of each Purchase Agreement provides: "In accordance with the directions of the Company's Board of Directors, as it shall be constituted in accordance with the Voting Agreement, the Company will use the proceeds from the sale of the Shares for product development and other general corporate purposes."

37. Section 4.6 provides: "As of the Initial Closing, the authorized size of the Board shall be 5, and the Board shall be composed of the President, CEO, and three investors and consultants determined by election no later than March 31, 2022."

38. Section 2.11.1 represents that "there are no agreements, understandings or proposed transactions between the Company and any of its officers, directors, consultants or Key Employees, or any Affiliate thereof."

39. Section 3.11 records that Mr. Tourani was relying on "the Company and its officers and directors" in making his investment.

**E. Round 2 and the Purported Fulcrum Spin-Off**

40. On September 9, 2022, as he prepared to ask for more money, Mr. Manraj told Mr. Sharma via WhatsApp that Pvotal had "a few dozen investors coming in the next round at a $50 M valuation," and that Mr. Tourani would be allowed to buy ahead of them, at a $25 million valuation, "for another 10%." In the same exchange, he wrote: "In case Mahesh [didn't] tell you, we did get an offer from Google." Pvotal would "pass," he said, and "restructure the

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

company to extract the tools they want to acquire into a separate entity so we can sell it next year."

41. On September 13, 2022, Mr. Manraj put the proposal in writing. Pvotal, he wrote, would be "focused on cloud technologies of specific interest to Google Cloud in an effort to plan a potential sale or partnership within the next two years." He listed what Mr. Tourani would hold, including "25% of ownership in Pvotal Technologies Inc.," "25% of ownership in Fulcrum Innovations Inc. (5,000,000 shares at a par value of $1)," and a "10% stake in Arex Capital." And he asked for "$500k to Pvotal Technologies by 20th September 2022 for the last hires and staff," explaining that Pvotal was "planning to hire about 20 new staff in the next few weeks."

42. On September 26, 2022, Mr. Manraj explained the specifics of his planned spin-off. "Mahesh has committed $2.5M at a $25M valuation for Pvotal - that is 2 million new shares," Mr. Manraj wrote. Mr. Tourani would also receive duplicate shares in a new company, Fulcrum Innovations, "so he can benefit from both Pvotal (which we are trying to sell to Google within 1-2 years) and retain ownership of the current business operations in Fulcrum." "Since Google already started talking to Pvotal," he added, "we are letting them acquire this and moving all non interested IPs to Fulcrum."

43. In reliance on Mr. Manraj's representations about an imminent Google deal, Mr. Tourani invested an additional $2,500,000 in four installments between September 29, 2022, and June 20, 2023. On January 10, 2023, Mr. Manraj asked for "another transfer" to fund "a new wave of hires before we issue job offers next week," and Mr. Tourani paid $500,000 a week later. In March 2023, citing the failure of Silicon Valley Bank and a "payroll crisis," he asked Mr. Sharma to "wire a tranche so our accountant doesnt panic," and Mr. Tourani paid $500,000 on March 22.

44. In June 2023, Mr. Stoller pressed the Family Office for the last $1,000,000 of the round. He wrote that Pvotal was forming three new companies, Fulcrum Innovations Inc., Alea Gaming Services LLC, and X Cloud Technologies. Mr. Tourani would receive five million shares of each "with no additional cost or dilution," but the new shares could not be

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

issued until the current Pvotal round closed. He also wrote that Pvotal "is estimated to be at $11.50" a share, more than nine times the $1.25 Mr. Tourani was paying. Mr. Tourani paid the $1,000,000, and Pvotal received it on June 20, 2023.

45. On information and belief, Google never made an offer for Pvotal or for any part of its technology, no group of investors was waiting to buy into Pvotal at a $50 million valuation, and nothing supported a share price of $11.50. Mr. Tourani has received no evidence of any ownership of Alea Gaming Services LLC, X Cloud Technologies, or Arex Capital.

46. What Mr. Tourani was to receive in Fulcrum Innovations changed with each telling: "25% of ownership" in September 2022, "duplicate shares" later that month, five million shares "with no additional cost or dilution" in June 2023, and, finally, half of Fulcrum once Pvotal's businesses were divided in June 2023. Mr. Tourani has never received shares of Fulcrum or any document evidencing an interest in it. Fulcrum instead became Pvotal's largest stockholder. On the shareholder list Pvotal provided with the June 2023 Round 2 paperwork, Fulcrum held 6,000,000 Pvotal shares, 28.64 percent of those listed, while Mr. Manraj held 655,000 in his own name.

47. On December 16, 2024, Pvotal issued Fulcrum a certificate for its 6,000,000 shares, reciting a "Transfer Amount" of "N/A" and a "Total Share Value (Current)" of $77,100,000. Mr. Manraj sent it to the Family Office for electronic signature with a note reading: "Mahesh Tourani 50% / Yashin Manraj 50% / - Fulcrum Documents to follow / be signed after I review them." No Fulcrum documents followed. The shareholder list Pvotal sent the Family Office in April 2025 showed Fulcrum holding 24.68 percent of Pvotal and Mr. Manraj 1.05 percent, without saying who owned Fulcrum. In June 2025, Pvotal sent the Family Office another certificate, captioned "Joint Ownership" and prepared for Mr. Tourani and "Fulcrum Innovations LLC," for 3,000,000 shares of Pvotal stock, again reciting no payment. In documentation sent in October 2025, Pvotal reported that "Fulcrum Innovations is owned and operated by Pvotal's CEO Yashin Dev Manraj." On information and belief, Fulcrum paid nothing for its Pvotal shares, and Mr. Manraj controls Fulcrum and the shares it holds.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

**F. Round 3 and Further Representations About a Google Deal**

48. On October 2, 2023, Mr. Stoller told Mr. Sharma that Pvotal was "extremely busy with the new Google partnership" and that "we have only 3 months to finish thousands of compliance and legal training so we can become an official partner." Three days later, on October 5, he sent the Family Office the draft agreement for Round 3. Mr. Tourani would pay $1.333 a share, he wrote, "but the official share price is $6.150 as per Carta's 409A valuation of Early 2023 - however, we have been instructed to provide it at the lowest possible price." The price had been raised slightly from the last round, he explained, "so that on paper it does not appear to be a down round." The money "is primarily allocated for the hiring of 15 new staff and consultants by January 15th 2024." On December 15, 2023, between Mr. Tourani's first and second Round 3 payments, Mr. Stoller reported that Pvotal's "share price has been updated to $10.29 for this year."

49. On information and belief, no 409A valuation by Carta or anyone else valued Pvotal's stock at $6.15 a share, and nothing supported a price of $10.29. Mr. Tourani paid $2,000,000 for Round 3 in three installments between November 8, 2023, and February 23, 2024. In those same months, Ms. Wilson bought the Chico Property, and Pvotal wired $38,000 to Mauritius with the reference "Sbm Loan Repayment," on a loan of which it has no record.

**G. Rounds 4 and 5**

50. In May 2024, Mr. Tourani, in reliance on Mr. Manraj's representations about the company's value, the imminent Google partnership, and the need for operational funding, decided to invest another $2,000,000. When Mr. Sharma told Mr. Stoller so on May 20, Mr. Stoller asked whether a wire could be sent "before the end of this week so they can process payroll and other payments." Two days later, Mr. Sharma asked Mr. Manraj for an offer letter for the $2,000,000, because the Family Office's bank needed "a proof for what purpose the funds are going." Mr. Manraj sent one that evening, signed and addressed to Mr. Tourani in care of Mr. Sharma. It offered a "50% discount based on our latest company valuation" on a "two million ($2 M) USD stake": 1,000,000 shares at $2.00, payable $1,000,000 by May 26 and $1,000,000 by August 26, 2024. It said the money would be used "[t]o facilitate our

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

operations, payroll, and expenses." Mr. Tourani paid as requested, and paid a further $1,000,000 in November 2024 (together, "Round 4").

51. Around the time of Round 4, Mr. Manraj told the Family Office that Infrastream was launching with Google. On October 23, 2024, he wrote that the "Infrastream launch with Google has been consuming all my days" and that "we are finally ready to launch globally." On November 13, 2024, Mr. Stoller explained that Pvotal had reissued its investors' shares as a new class "[a]t the request of Google Ventures." The same day, Mr. Manraj wrote: "Last Carta SPV is $12.85 in case Mahesh asks and I forget to tell him. We haven't done a new evaluation yet, probably will do one in March 2025." He wrote that "all the updated investments are in the SPA Annex." That annex, to Pvotal's November 2024 purchase agreement, carried Mr. Tourani's 8,059,644 shares at a "Current Tally" of $103,566,425.40, or $12.85 a share, and the certificates Pvotal reissued that month recited the same $12.85 "current" value. Asked about the share price for the November payment, he explained, "We have to show a small increase in the offer to prevent any stagnation for evaluators hence why we increased it by 25 cents per share." On November 19, 2024, as the Family Office waited on paperwork to release the November payment, he wrote that he was "finishing a call with Google staff."

52. On information and belief, Infrastream did not launch with Google, globally or otherwise, in 2024, Google Ventures made no request of Pvotal and held no interest in it, and no special purpose vehicle or other investor ever bought Pvotal stock at $12.85 a share. Infrastream did not launch publicly until August 2026.

53. In March 2025, Mr. Tourani paid a further $450,000 in two payments: $340,000 on March 11 and $110,000 on March 20. At the Family Office's request, Mr. Manraj documented the purchase in a letter dated March 10, 2025, which he signed and sent on March 18. It extended the same "50% discount based on our latest company valuation," this time at $2.50 a share, and again said the money would be used "[t]o facilitate our operations, payroll, and expenses."

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

54. From then on, the Family Office funded Pvotal month by month, sending what it understood to be Pvotal's shortfall for payroll and other expenses. Between April 2025 and August 2026, Mr. Tourani made thirteen more payments, totaling $3,007,252. Throughout that time, Mr. Manraj told Mr. Tourani that Pvotal was nearing the point at which it would be cash-flow positive.

55. On information and belief, no priced financing or independent appraisal supported the "latest company valuation." The only valuations in Pvotal's records are figures Mr. Manraj entered in the ledgers he attached to Pvotal's purchase agreements, which carried a company valuation of $9,357,617 in 2021 and $112,114,348 by May 2026. Over its entire life, through July 2026, the Chase Account received $1,637,163.63 from customers.

56. The representation that new money would "facilitate our operations, payroll, and expenses" also conveyed that Pvotal's existing capital was being spent on its operations. It was not. Throughout 2024 and 2025, Pvotal paid "Boa Corp" $15,000 and "Regence" more than $6,600 nearly every month. On August 26, 2024, five days after Mr. Tourani paid the second $1,000,000 the May 2024 letter requested, Pvotal began paying "Mckinsey" $17,701.80 a month, a series of nine payments that continued past the March 2025 letter and through October 2025. In 2024 alone, Pvotal paid American Express $1,115,222.14.

**H. Climbing Valuations and the Investor Document**

57. As the payments continued, Mr. Manraj told Mr. Tourani that Pvotal's value was climbing, from the $7.5 million at which Mr. Tourani first invested to $20 million, $30 million, $40 million, $50 million, and beyond, and ultimately to $385 million. He also told Mr. Tourani that his stake grew with each investment, until it reached half of the Company. When later paperwork showed a smaller percentage, Mr. Manraj attributed the difference to grants to employees and to a reduction of his own holdings.

58. Pvotal's investor document dated August 28, 2025 (the "Investor Document") states: "Since its incorporation in 2021, Pvotal has generated $4,106,023.47 and has raised $12,041,500.20." It reports 27,549,133 shares "at a current estimated value of $12.85," which values the Company at about $354 million. On information and belief, Pvotal had not generated

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

anything close to $4.1 million: even through July 2026, its operating account had received only $1,637,163.63 from customers.

59. The Investor Document was not prepared on August 28, 2025. It contains a shareholder table dated September 20, 2025, lists as a holder an investor whose purchase Mr. Manraj solicited on October 7, 2025, gives employee hire dates of September 22 and October 6, 2025, and describes the Columbia account as opened "as of October 2, 2025." It bears Ms. Beiter's signature. On information and belief, she did not prepare or sign it. Mr. Manraj sent it to the Family Office on October 7, 2025, describing it as part of a package that Ms. Beiter had compiled.

**I. Mr. Tourani Requests Documents Supporting His Investment and Mr. Manraj Purports to Move the Company to Nevada**

60. Through all five investment rounds, Pvotal's paperwork lagged Mr. Tourani's money. Agreements and stock certificates came months after payments were made, if they were ever shared at all. Mr. Manraj's explanations for the delay varied: his lawyer was "in an extended holiday," or "at a conference in Hawaii," or he himself had not had time "to sit down and read any legal agreements." The Round 2 agreement, dated September 12, 2022, was digitally signed by Mr. Manraj on June 20, 2023, and recites that the round's final $1,000,000 was "executed on May 31, 2023." Pvotal received it on June 20. The November 2024 agreement, dated as of November 13, 2024, was signed by Mr. Manraj on December 16, 2024, nearly four weeks after Mr. Tourani paid, and countersigned for Mr. Tourani on January 9, 2025.

61. In mid-2025, the Family Office's bank asked for documents to complete its review of Mr. Tourani's holdings, and Mr. Sharma asked Mr. Manraj for Pvotal's balance sheet and current shareholding, certified by Pvotal's auditor or counsel. For months, Mr. Manraj said the documents were nearly ready. On October 7, 2025, he wrote that he had "[j]ust left Chase in SF" and that the bank would be "emailing the signed copy validating the bank account soon." That day he sent the Investor Document and other materials, calling them "the KYC packet that Elisa and the team made for you" and adding: "Chase has reviewed it and said this meets

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

the US standards, but they cannot guarantee that it would be sufficient for a UAE bank." When Mr. Sharma insisted on certification, Mr. Manraj wrote that Pvotal's auditor was "reviewing the records and ensuring they match," and, on October 16, 2025, that he had "got the shares certified by an independent lawyer" and obtained a "state certified copy for key pages." No certified document ever arrived. On January 16, 2026, Mr. Sharma wrote that he still had not received the audit statement and could not transfer money without it. Mr. Manraj promised to scan and send it within days. He never did. Mr. Tourani's 2026 payments followed.

62. On July 24, 2025, Mr. Manraj told Mr. Sharma that Pvotal would be "closing our Delaware company, and reissuing all documents for a Nevada entity by September." On September 29, 2025, he asked the Family Office to wait for documents until "we finish our move from Delaware to Nevada." On October 8, 2025, sending the Family Office a letter for another investor, he wrote that "[t]he new bank details for Columbia Bank are included and will be used going forward as we migrate all operations to Nevada to prepare for our Delaware exit." On October 9, 2025, he sent wiring instructions for what he called "the Nevada branch of Columbia Bank," explaining that he "could not get to Chase to open a Nevada account remotely, so I opened a Columbia Bank account" (the "Columbia Account").

63. Mr. Manraj documented the 2026 purchases in five purchase agreements bearing printed signature dates of January 20, February 23, March 24, April 23, and May 26, 2026. The Family Office had asked for them repeatedly from April 23, 2026 on. Their electronic audit trails show that Mr. Manraj signed all five on the morning of May 26, 2026, within four minutes, from Chico. By then Mr. Tourani had already paid for the shares covered by all five.

64. The share certificates for those purchases recite payment by "Fedwire Credit (Chase)." Those payments went not to Chase but to the Columbia Account. Pvotal has not issued certificates for all the money paid for Mr. Tourani's account in June, July, and August 2026.

65. Pvotal's certificate of incorporation, filed June 2, 2021, authorizes it "to issue a total number of shares of 1,500,000 shares," with a par value of $0.0001. On information and

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

belief, it has never been amended. Pvotal's purchase agreements nonetheless represented that Pvotal was authorized to issue 17,500,000 shares (November 2021), 20,000,000 (September 2022), 22,453,000 (October 2023), and 25,000,000 (November 2024 through May 2026), the last at a stated "par value" of $12.85 and then $14.85 a share. They represented that 5,000,000, then 10,000,000, then 20,000,000 shares were outstanding, and every agreement from October 2023 through May 2026, including each 2026 agreement, gave the same figure of 20,000,000. Pvotal's own shareholder lists showed 20,961,400 shares in June 2023, 24,261,948 in March 2025, and 27,549,133 in September 2025.

66. By Pvotal's own account, 5,000,000 shares were outstanding before Mr. Tourani's first purchase, more than three times the number its charter allowed. Every share Pvotal purported to sell him was therefore issued beyond its authority. On information and belief, those shares are void, and Mr. Tourani received nothing of value for the $12,082,252 he paid.

**J. Mr. Tourani's Total Investment**

67. Between November 2021 and August 2026, Mr. Tourani paid $12,082,252 for Pvotal stock in twenty-nine transfers. Pvotal's ledger attributes the following shares to him:

| Round | Transfers | No. | Amount | Shares (per Pvotal ledger) |
|---|---|---|---|---|
| 1 | Nov. 12, 2021–Mar. 7, 2022 | 4 | $1,125,000 | 3,000,000 at $0.375 |
| 2 | Sept. 29, 2022–June 20, 2023 | 4 | $2,500,000 | 2,000,000 at $1.25 |
| 3 | Nov. 8, 2023–Feb. 23, 2024 | 3 | $2,000,000 | 1,399,980 at $1.25–$1.50 |
| 4 | May 28, 2024–Nov. 20, 2024 | 3 | $3,000,000 | 1,659,664 at $1.70–$2.00 |
| 5 | Mar. 11, 2025–Aug. 3, 2026 | 15 | $3,457,252 | 1,018,686 at $2.50–$4.05 |
| **Total** | | **29** | **$12,082,252** | **9,078,330** |

68. The individual transfers are listed below. In the "From" column, "MT" is an account of Mahesh Tourani, "RT" is an account of Rohan Tourani, alone or jointly with Ishwari Tourani or Mr. Tourani, and "K" is the Khubchandani family account whose July 2025 transfer

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

Pvotal credited to Mr. Tourani. Twenty-one transfers went to the Chase Account and seven to the Columbia Account. Mr. Tourani's remittance records show the August 3, 2026, transfer directed to the Columbia Account as well.

| Round | Date | Amount | From | Received in |
|---|---|---|---|---|
| 1 | November 12, 2021 | $250,000.00 | RT | Chase Account |
| 1 | December 6, 2021 | $291,700.00 | MT | Chase Account |
| 1 | January 4, 2022 | $291,700.00 | MT | Chase Account |
| 1 | March 7, 2022 | $291,600.00 | MT | Chase Account |
| 2 | September 27, 2022 | $500,000.00 | RT | Chase Account |
| 2 | January 17, 2023 | $500,000.00 | MT | Chase Account |
| 2 | March 20, 2023 | $500,000.00 | MT | Chase Account |
| 2 | June 22, 2023 | $1,000,000.00 | RT | Chase Account |
| 3 | November 9, 2023 | $500,000.00 | RT | Chase Account |
| 3 | December 19, 2023 | $500,000.00 | RT | Chase Account |
| 3 | February 23, 2024 | $1,000,000.00 | RT | Chase Account |
| 4 | May 27, 2024 | $1,000,000.00 | RT | Chase Account |
| 4 | August 20, 2024 | $1,000,000.00 | RT | Chase Account |
| 4 | November 20, 2024 | $1,000,000.00 | RT | Chase Account |
| 5 | March 11, 2025 | $340,000.00 | MT | Chase Account |
| 5 | March 20, 2025 | $110,000.00 | RT | Chase Account |
| 5 | April 29, 2025 | $350,000.00 | RT | Chase Account |
| 5 | June 19, 2025 | $386,500.00 | RT | Chase Account |
| 5 | July 23, 2025 | $344,000.00 | K | Chase Account |
| 5 | August 20, 2025 | $295,000.00 | RT | Chase Account |
| 5 | September 19, 2025 | $265,000.00 | RT | Chase Account |
| 5 | January 20, 2026 | $247,102.00 | MT | Columbia |
| 5 | February 23, 2026 | $283,650.00 | MT | Columbia |

| Round | Date | Amount | From | Received in |
|---|---|---|---|---|
| 5 | March 24, 2026 | $234,000.00 | MT | Columbia |
| 5 | April 22, 2026 | $231,000.00 | RT | Columbia |
| 5 | May 22, 2026 | $165,000.00 | RT | Columbia |
| 5 | June 22, 2026 | $96,000.00 | RT | Columbia |
| 5 | July 20, 2026 | $60,000.00 | RT | Columbia |
| 5 | August 3, 2026 | $50,000.00 | RT | Columbia |
| **Total** | | **$12,082,252.00** | | |

69. Payments made for Mr. Tourani's account and credited to him make up about 92 percent of the $11,632,972.26 in investor funds deposited into the Chase Account over its life. Counting the $1,201,963.67 the Columbia Account forwarded to the Chase Account in 2026, nearly all of which came from Mr. Tourani's payments, money paid for his account supplied about three of every four dollars that entered the Chase Account from any source (including operating income).

**K. Mr. Manraj Misappropriated the Company Funds**

70. From June 17, 2021, through July 31, 2026, the Chase Account received $15,835,840.55 and paid out $15,833,460.40. On July 31, 2026, it held $2,380.15. Because Mr. Tourani's payments supplied most of that money, the payments described below were made, in substantial part, with his money.

71. Chase's statements print only the nicknames Pvotal assigned to its saved payees. Behind several of those nicknames are accounts whose holders Pvotal's operating team cannot identify. Pvotal's operating leadership has found no contract, invoice, approval, or other record establishing a legitimate business purpose for the following payments (the "Questioned Payments"):

| Payee (as saved by Pvotal) | Payments | Period | Amount |
|---|---|---|---|
| "Boacorp" (account ending 9006) | 58 | Nov. 2021–June 2026 | $789,580.09 |



GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

| Payee (as saved by Pvotal) | Payments | Period | Amount |
|---|---|---|---|
| Account ending 4721 (Mr. Manraj) | 9 | 2022–June 2023 | $130,752.35 |
| “Mckinsey” (account ending 6852) | 20 | Sept. 2022–Oct. 2025 | $582,016.39 |
| “Regence” (account ending 2645) | 61 | June 2021–June 2026 | $419,982.34 |
| “William” (account ending 1771) | 3 | Oct.–Nov. 2022 | $150,000.00 |
| Account ending 7773 | 7 | Nov. 2021–Oct. 2025 | $79,000.00 |
| Emirates NBD, Dubai | 1 | Feb. 2023 | $50,675.14 |
| SBM, Mauritius | 2 | Dec. 2023–Mar. 2024 | $48,000.00 |
| **Total** | 166 | | **$2,250,006.31** |

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

***1. “Boacorp”***

72. Pvotal paid “Boacorp” (account ending 9006) 58 times: thirteen payments of $8,754.11, forty-two of exactly $15,000, and three others, for a total of $789,580.09. The first was initiated on November 13, 2021, the day after Pvotal received Mr. Tourani’s first $250,000. The last, $15,000, went out on June 30, 2026, when Pvotal had yet to pay its team for June.

73. On information and belief, account 9006 is held and controlled by Mr. Manraj, and his personal Bank of America credit cards are paid from it.

74. Mr. Manraj has described these payments as installments on a bank loan. On August 6, 2026, he wrote, “Boa loan $206k left.” Pvotal’s records reflect no Bank of America loan to Pvotal. Had Pvotal borrowed from Bank of America, the proceeds would have reached its only operating account. Apart from a single $24,500 wire from Mr. Manraj through Bank of America on June 5, 2023, labeled “Consultancy Services,” nothing identifiable as the proceeds of any Bank of America loan reached the Chase Account.

***2. Account 4721***

75. Pvotal’s employee bank account records identify account 4721 as Mr. Manraj’s. Between November 17, 2021, and June 21, 2023, Pvotal sent it fourteen transfers labeled as

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

payroll, totaling $189,085.68. Nine of those transfers, totaling $130,752.35, came after Pvotal began running its payroll through Gusto on February 25, 2022, and were made outside Gusto.

76. On June 21, 2023, the day after Pvotal received $1,000,000 of Round 2, it sent two $25,000 payments to account 4721 and a third $25,000 payment to account 7773. On information and belief, account 7773 is under Ms. Wilson's control.

***3. "Mckinsey"***

77. Pvotal paid account 6852 for "Mckinsey" twenty times, for a total of $582,016.39. The first payment, $55,950.19, went out on September 22, 2022. Nine payments of $17,701.80 followed between August 2024 and October 2025.

78. On information and belief, account 6852, labeled "Mckinsey," is an account under Mr. Manraj's control. Pvotal's operating leadership has found no record of any engagement of McKinsey & Company: no contract, statement of work, or invoice. No one on the operating team ever received a call or written communication from McKinsey, and Mr. Manraj's Company calendar shows no legitimate external invitation involving a McKinsey organizer or attendee.

***4. "Regence"***

79. Between June 29, 2021, and June 30, 2026, Pvotal paid account 2645, to "Regence," sixty-one times, for a total of $419,982.34: forty-one payments of $6,673.54 and then, from October 25, 2024, twenty payments of $7,318.36.

80. There is an insurance company called Regence. Plaintiff is informed and believes that Pvotal did not maintain a health care plan for its employees.

81. On July 3, 2026, Mr. Manraj asked that Pvotal "send a wire BoA and Regence as all the credit card charges are pulled from there for G suite and all past payments." By that account, "Boacorp" and "Regence" were accounts from which credit card charges were paid. That description cannot be squared with his later account of the "Boacorp" payments as installments on a bank loan, or with "Regence" being a health insurer.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

82. On information and belief, account 2645 does not belong to Regence or to any insurance carrier, and the payments to it, beyond any legitimate premium, went to Mr. Manraj's use.

***5. "William"***

83. Pvotal paid account 1771 for "William" $50,000 on each of October 4, October 21, and November 25, 2022, in the weeks after it received the first $500,000 of Round 2. The only William who has worked for Pvotal is a contractor paid about $6,000 a month through an account ending in different digits. On information and belief, the "William" nickname was used to obscure the true recipient, and account 1771 is an account controlled by Mr. Manraj.

***6. Account 7773***

84. Between November 23, 2021, and October 24, 2025, Pvotal sent seven transfers totaling $79,000 to an account ending 7773. On information and belief, account 7773 belongs to Ms. Wilson. Pvotal has no record that Ms. Wilson ever performed services for it.

***7. Dubai and Mauritius***

85. On February 21, 2023, Pvotal wired $50,675.14 to Emirates NBD Bank in Dubai with the reference "Pvotal Diamond/Bnf/Pvotal Fees." On December 27, 2023, it wired $38,000 to SBM Bank (Mauritius) with the reference "Sbm Loan Repayment." On March 1, 2024, it wired $10,000 to a beneficiary named "Dharam" in Vacoas, Mauritius, with the same reference. Mr. Manraj's father is Dharam Dev Manraj. Pvotal has no record of any loan that these wires could have repaid. On information and belief, these wires went to Mr. Manraj's benefit.

***8. American Express***

86. Between June 20, 2023, and July 2026, Pvotal made 345 payments to American Express, totaling $2,725,857.77, every one of them recorded under Mr. Manraj's name. The first, on June 20, 2023, went out the day Pvotal received $1,000,000 of Round 2 funding from Mr. Tourani and the day Mr. Manraj digitally signed the Round 2 agreement. On July 23, 2025, the day a $344,000 investment credited to Mr. Tourani arrived, Pvotal paid American Express

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

$98,726.03. By year, the payments totaled $582,099.15 in 2023, $1,115,222.14 in 2024, $733,272.09 in 2025, and $295,264.39 in the first seven months of 2026.

87. The payments went to at least five American Express cards. Those cards carried some bona fide Company charges, including much of Pvotal's Google Cloud bill. But the vendor charges that can be identified account for roughly $33,000 a month in 2024 and $26,000 a month in 2025, while Pvotal's payments to American Express averaged about $92,900 and $61,100 a month in those years. On information and belief, much of the difference paid personal charges of Mr. Manraj and Ms. Wilson.

**L. The Columbia Account**

88. On information and belief, the Columbia Account, ending 7152, was opened on or about October 2, 2025. Payment instructions and wire records identify it by the name "Pvotal Tech" and the address 732 South 6th Street, Suite N, Las Vegas, Nevada, which the Investor Document gives as the address of the "registered agent" for a Pvotal "registered entity that operates out of Nevada." The wire for Mr. Tourani's March 24, 2026, payment, for example, was addressed to "Pvotal Tech" at that Las Vegas address and described the payment as "ADDITIONAL INVESTMENT IN PVOTAL TECH ON A/C OF MAHESH TOURANI." Pvotal's operating team was not told that investor money was being sent there and has never had access to the account. The exports Mr. Manraj produced identify no signer. On information and belief, Mr. Manraj alone controls it.

89. Mr. Manraj began directing investors to the Columbia Account in October 2025. On October 7, 2025, he wrote to another investor offering a "40% discount" on a $1 million purchase, to fund "operations, payroll, and expenses," and directed payment to the Columbia Account. The next day, that investor applied to remit $500,000 to it. Between October 22 and December 19, 2025, the Columbia Account sent three wires totaling $731,382.36 into the Chase Account. The November wire was labeled "Pvo Tal Technologies Loan."

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

90. In 2026, at Mr. Manraj's direction, the payments made for Mr. Tourani's account went to the Columbia Account. From January 1 through July 31, 2026, apart from small fee credits, they were the only money the account received:

| **Columbia Account, January 1–July 31, 2026** | **Amount** |
|---|---|
| Opening balance (implied) | $29,132.04 |
| Deposits from Mr. Tourani's accounts (3 wires) | $764,752.00 |
| Deposits from Rohan Tourani's accounts (4 wires) | $552,000.00 |
| Deposits from anyone else | $0.00 |
| Transfers to the Chase Account (10 wires) | ($1,201,963.67) |
| Payments to American Express (25 debits) | ($104,733.68) |
| Bank fees, net | ($225.00) |
| **Balance, July 31, 2026** | **$38,961.69** |

91. Money that arrived as payment for stock was forwarded to Pvotal under wire descriptions calling it a loan. On January 20, 2026, Mr. Tourani's $247,102 arrived with wire text beginning "ADDITIONAL I…." Two days later, $248,103.44 went to Pvotal labeled "PVOTAL PAYROLL LOAN." On May 26, 2026, $165,000 arrived from Rohan Tourani's account, and $164,500 went to Pvotal the same day labeled "PVOTAL LOAN." In all, the Columbia Account sent Pvotal thirteen wires totaling $1,933,346.03, of which $656,353.44 were expressly labeled loans.

92. On information and belief, Mr. Manraj represented to Ashley Manraj, who then relayed to other members of the Pvotal operating team, that the funds transferred from the Columbia Account were funds owned by Mr. Manraj that he had separately earned as consulting income and that he was lending to Pvotal to meet its operating expenses.

93. The effect, and on information and belief the purpose, of routing investment money through the Columbia Account and describing it as loans was to put Mr. Manraj, or an entity he controls, in a position to claim that Pvotal owes it $1,933,346.03 for money he himself

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

lent to the Company, when he was simply passing along money that Mr. Tourani and others had paid for Pvotal stock.

**M. The American Express Credit Line**

94. American Express carries a line of credit, ending 1344, in the name "Pvotal Technologies or D MANRAJ, YASHIN." Its balance reached $90,667.67 in April 2026 and stood at $28,386.14 in August 2026.

95. On October 23, 2025, $24,178.93 was drawn on the line as "Loan Proceeds to Third Party." It never reached Pvotal; the recipient is unknown. On March 17, 2026, $83,900 was drawn. It reached the Chase Account the next day, and that same day Pvotal paid $74,070.79 to Mr. Manraj's American Express cards in six payments.

**N. The Chico Property**

96. Ms. Wilson bought the Chico Property, a horse property in Chico, California, in late 2023. Mr. Manraj lives at the Chico Property. Pvotal's bank statements are mailed there, and every American Express statement Mr. Manraj produced is addressed to him there.

97. Since the purchase, the property has been substantially rebuilt. Butte County permit records show a 400-amp electrical service and HVAC replacement (December 2023); kitchen, bath, ductwork, and siding work (February 2024); an accessory dwelling and detached garage (April 2024); paving and an electrical-service upgrade (late 2024); a replacement single-family dwelling with an addition and covered area (January 2025); and solar with battery storage (July 2025). In mid-2024, Mr. Manraj corresponded with a builder and a design firm about plans the designer called an "Equestrian Ranch House."

98. On February 11, 2025, Ms. Wilson sued the property's sellers and brokers over unpermitted structures. *Wilson v. Fadale*, No. 25CV00584 (Butte Cnty. Super. Ct.). She is represented by SAC Attorneys LLP, alleges that she has spent more than $500,000 on the property, and seeks at least $2,721,177.37.

99. On information and belief, the following American Express charges were for work at the Chico Property or for Ms. Wilson's lawsuit about it:

| Charge date | Merchant | Card | Amount |
|---|---|---|---|
| July 25, 2025 | Town Surveys Inc., Paradise, CA | Manraj (2000) | $1,600.00 |
| Sept. 27, 2025 | Town Surveys Inc., Paradise, CA | Manraj (2000) | $3,133.40 |
| Feb. 6, 2026 | Villicana Electric | Manraj (1005) | $16,950.00 |
| Feb. 21, 2026 | SAC Attorneys LLP | Manraj (1005) | $5,000.00 |
| Feb. 25, 2026 | Villicana Electric | Manraj (1005) | $12,673.87 |
| Mar. 27, 2026 | Villicana Electric | Wilson (1010) | $11,055.00 |

100. Pvotal's payments match several of these charges to the penny. On September 29, 2025, Pvotal paid American Express exactly $3,133.40, the amount of the second Town Surveys charge. On February 25, 2026, it paid $18,348.82 on the card ending 1005, exactly the first Villicana charge and the SAC Attorneys charge net of a $3,601.18 credit. On March 18, 2026, it paid $14,594.24 on the same card, exactly its March 3 closing balance, which included the second Villicana charge. On the account that carries Ms. Wilson's card, it paid $29,264.09 on February 25, 2026, exactly that account's prior balance, and $16,758.61 and $15,520.36 on March 18 and 25, 2026.

101. How the purchase itself and most of the rebuild were paid for is not yet known. But by the time of the closing, Pvotal had paid $244,252.35 into account 4721 (outside its payroll system) and account 7773, and it kept paying "Boacorp," "Mckinsey," and "Regence" throughout the rebuild. On information and belief, Pvotal's money, and with it Mr. Tourani's, was used to acquire, improve, and maintain the Chico Property, through those accounts and through the American Express cards.

102. On information and belief, Mr. Manraj and Ms. Wilson were married when the Chico Property was acquired, and it is community or quasi-community property liable for debts Mr. Manraj incurred during the marriage, whatever the form of title.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

**O. Missed Payroll, June–August 2026**

103. Until June 2026, Pvotal paid its employees on the 26th of each month, and its operating leadership knows of no missed or late payroll before then.

104. On June 22, 2026, $96,000 from Rohan Tourani's account reached the Columbia Account. The next day, the Columbia Account paid American Express $21,669.28 in six debits. On June 26, payday, it paid American Express another $10,000. It sent nothing to Pvotal in June. On June 30, it held $87,091.12. That same day the Chase Account paid $15,000 to "Boacorp" and $7,318.36 to "Regence."

105. Pvotal was not able to pay its June 26, 2026, payroll.

106. Pvotal historically made payroll payments on the 26th of each month. In June 2026, there were insufficient funds available for Pvotal to make payroll payments on the 26th. On July 2, 2026, a partial payment was made after Ashley Manraj managed to raise funds on his own. That Pvotal required additional investor funds to make payroll was not of itself unusual. Pvotal, throughout its history, had only generated limited revenue and primarily met operating expenses through outside investment (mostly from Mr. Tourani). What was unusual was that Pvotal's bank accounts lacked sufficient funds to pay payroll and that Yashin Manraj had not secured additional investor funds to cover the shortfall.

107. Also on July 2, Mr. Manraj caused account 9006 to pay $11,306.25 toward Mr. Manraj's personal Bank of America cards.

108. On July 21, 2026, $60,000 from Rohan Tourani's account reached the Columbia Account.

109. Pvotal had no funds to run payroll at all on July 26.

110. On July 30, Mr. Manraj caused the Columbia Account to wire $16,523.41 to the Chase Account with the text "MACY WILSON," and caused the Chase Account to pay a $14,402.84 installment on the American Express credit line. On July 31, Mr. Manraj caused the Columbia Account to pay American Express another $35,059.15.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

111. In short, across June and July 2026, as Pvotal's employees went unpaid, Mr. Manraj caused the Columbia Account to send $104,362.28 to American Express and $39,645.75 to Pvotal.

112. At first, Pvotal's operating leadership believed that Pvotal's lack of funds to pay payroll, and Mr. Manraj's apparent failure to secure outside funds and transfer them to the Chase Account, was due to a temporary liquidity shortfall associated with the upcoming launch of Pvotal's product, Infrastream. Ashley Manraj communicated to the team that, if Infrastream was successfully launched, more funds would be released. Accordingly, Pvotal's staff worked without pay to launch Infrastream on August 4, 2026. But Mr. Manraj did not release any funding to pay Pvotal's employees, who never received paychecks after July 9, 2026, save for a small partial payment to some employees in August.

**P. The August 13, 2026, Production**

113. In the summer of 2026, after payroll failed, Mr. Tourani's representatives and Pvotal's operating team spoke directly for the first time and found that their understandings of Pvotal's finances did not match. Mr. Tourani spoke to Mr. Manraj and demanded that he produce financial records for the Tourani family and Pvotal's leadership team to review. On August 13, 2026, Mr. Manraj sent to Ashley Manraj 75 files: 38 American Express card statements, 12 statements for the credit line, 7 Columbia Account exports, and 18 Bank of America card statements.

114. Pvotal's head of engineering, Mickael Guesnon, conducted an analysis of the bank statements provided by Mr. Manraj, initially to ascertain if they had proper security signatures, which would indicate they were authentic and untampered. His review determined that, for three files, not only were the signatures incorrect, but the PDF contents had been modified shortly before they were shared. Each was an American Express statement, all for the account ending 2000 on which Ms. Wilson holds an additional card ending 1010. The files reached the team from Mr. Manraj at 2:18 p.m.:

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

| Statement | Shown in file provided | Recovered original | Amount |
|---|---|---|---|
| October 24, 2025 | GOOGLE *WORKSP / COMPUTER | TOWN SURVEYS INC., Paradise CA | $3,133.40 |
| April 24, 2026 | Cardholder "PVOTAL TECH", card 7-41010 | Cardholder "MACY L WILSON" | — |
| April 24, 2026 | LAWPAY, Sacramento CA | VILLICANA ELECTRIC, Chico CA | $11,055.00 |
| April 24, 2026 | AIRPORT DCW/ SUBSCRIPTION | VCA ANIMAL HOSPITALS, Los Angeles CA | $32.28 |

115. The March statement was rewritten so thoroughly that its original data cannot be recovered, but it shows two charges on Ms. Wilson's card, now under "PVOTAL TECH," of $20,000 to "OTTERPR *SERVICE" and $15,510.45 to "LAWPAY." The altered files are internally inconsistent. The April statement's summary still reads "MACY L WILSON." Pvotal's genuine Google Workspace charges read "GOOGLE*GSUITE_PVOTAL.TECH" and never exceeded $878.86.

116. Each edit concerned the account carrying Ms. Wilson's card. The Villicana and SAC Attorneys charges on Mr. Manraj's card ending 1005, $34,623.87 in all, were not changed. "PVOTAL TECH," the name substituted for Ms. Wilson's, is the name on the Columbia Account.

117. On information and belief, Mr. Manraj altered the statements, or had them altered, before sending them. He was asked for the records, controls the accounts they describe, and sent the files within seven minutes after the last edit.

118. Mr. Manraj has not communicated with Mr. Tourani, with Pvotal's operating leadership, or, on information and belief, with any Pvotal investor since August 13, 2026.

119. With no meaningful prospect of receiving funds to satisfy its ongoing payroll obligations, Pvotal employees were formally terminated and Pvotal wound down operations on or around August 18 and 19, 2026. Twenty-six current and former team members are owed more than $256,000 in wages for June through August 2026.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

**Q. Infrastream and Pvotal Had Little Actual Value**

120. In September 2026, after Pvotal had shut down, Daniel Molloy Ltd, a technology-assessment firm in Exeter, England, delivered a report on Infrastream. It found that Infrastream had earned “zero product revenue,” that all four of its marketed security claims “fail as stated,” that, without enforced multi-factor authentication, the product “fails a standard enterprise security audit (SOC 2)” and that a customer result Pvotal had publicized, a client whose costs fell from $6 million to $600,000, came from a consulting engagement rather than from the product. It valued Infrastream as it stood at roughly $15,000 to $60,000 for the code alone, and at no more than $150,000 to $200,000, the cost of rebuilding it. On information and belief, Pvotal never obtained any of the certifications the Investor Deck listed.

121. The enterprise customers Mr. Manraj described never materialized. Over nearly five years, Pvotal’s operating account received $1,637,163.63 from customers of every kind. Pvotal’s own April 2026 board document, as the assessment reported, put Pvotal’s accumulated deficit at about $2 million and its monthly burn at about $150,000. The Investor Document Mr. Manraj had sent the Family Office six months earlier put Pvotal’s “current burn rate” at about $450,000. In 2026, the year by which the Deck projected that Pvotal could “clear $100M ARR,” Pvotal could not pay its employees.

122. On information and belief, Mr. Manraj kept Pvotal operating because an operating company was what kept Mr. Tourani paying. Mr. Manraj tied each request for Mr. Tourani’s money to operational needs, and never disclosed that he was using Pvotal’s accounts, and with it Mr. Tourani’s money, to enrich himself and Ms. Wilson.

**R. Discovery and Timeliness**

123. Mr. Tourani did not discover, and could not reasonably have discovered, the facts constituting the fraud until July and August 2026. Until then, Mr. Manraj was his only source of information about Pvotal’s finances, and Mr. Manraj concealed the truth: payments went to payees whose names did not identify them, investor money was routed through an account Pvotal’s own management could not see, the certified records Mr. Manraj promised never came, and the records Mr. Manraj finally produced had been altered. Nothing Mr.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

Tourani or the Family Office received before then disclosed the diversion. Mr. Tourani first learned that something was wrong when he learned that Pvotal's team had not been paid.

**FIRST COUNT**

**Violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

(Against Defendants Manraj and Pvotal)

124. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

125. The Pvotal shares Mr. Tourani bought are securities under Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). In connection with each purchase, Mr. Manraj and Pvotal used the instrumentalities of interstate and foreign commerce, including email, WhatsApp messages, international wire transfers, and electronic-signature services.

126. Mr. Manraj and Pvotal violated Rule 10b-5(b) by making the following untrue statements of material fact, and statements made misleading by what they omitted:

(a) **The November 2021 governance promises**. In the November 9 Email and the November 24, 2021, emails, Mr. Manraj promised that a board would have "ultimate control of financial and other company oversight," that Mr. Tourani would have a seat on it, and that Mr. Tourani would have a shareholder agreement and investor protections. Those statements conveyed that Mr. Manraj would not himself have sole and unsupervised control over the Company's finances, and with them over Mr. Tourani's investment. Mr. Manraj did not intend to keep those promises. The day after Mr. Tourani's first payment, he began paying Company money into account 9006, from which his personal credit cards are paid. Mr. Manraj never took a step toward any of the promised arrangements, and he controlled the Company's finances, without any functioning board, for nearly five years.

(b) **Sections 1.4 and 4.6 of the Purchase Agreements**. Each represented that investor money would be spent at the direction of a board constituted under a

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

Voting Agreement, and that a five-member board including three investors and consultants would be elected by March 31, 2022. No Voting Agreement existed. In the Round 2 and Round 3 agreements, those sections were also misleading by omission: Mr. Manraj repeated them without disclosing that no board had been elected and that he, not any board, was deciding how investor money was spent.

(c) **Section 2.11.1 of the Round 2 and Round 3 agreements**. These agreements represented that there were no agreements, understandings, or proposed transactions between the Company and its officers. These were false at the time because Pvotal had been making regular payments since November 2021 into account 9006, from which Mr. Manraj's personal credit cards are paid, and through June 2023 into account 4721, which its records identify as his, outside its payroll system, as well as paying Mr. Manraj and Ms. Wilson's credit card bills that included numerous personal charges.

(d) **The May 22, 2024, and March 10, 2025, letters**. Each told Mr. Tourani that his money would "facilitate our operations, payroll, and expenses," which conveyed that Pvotal's capital was being spent on its operations. This was false in that Mr. Manraj was then diverting that capital, and intended to continue doing so, through the Questioned Payments and the American Express accounts, including the monthly $17,701.80 "Mckinsey" payments that began five days after Mr. Tourani paid the second installment the May 2024 letter requested and continued past the March 2025 letter. Each letter also offered a "50% discount based on our latest company valuation," which conveyed that a valuation existed. On information and belief, none did apart from figures Mr. Manraj entered in ledgers he maintained, which bore no relation to Pvotal's receipts from customers, and Mr. Manraj did not believe that Pvotal was worth the value implied.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

(e) **The September 2022 statements**. Mr. Manraj's statements that Pvotal had received "an offer from Google," that Google had "already started talking to Pvotal" about acquiring it, and that "a few dozen investors" were coming into Pvotal's next round at a $50 million valuation were, on information and belief, false. They were made to induce Round 2.

(f) **The 2023 share prices**. Pvotal, through Mr. Stoller, told the Family Office in June 2023 that its shares were "estimated to be at $11.50," in October 2023 that "the official share price is $6.150 as per Carta's 409A valuation," and in December 2023 that the share price had been "updated to $10.29." On information and belief, no valuation supported any of those figures, and Pvotal had not been valued at $6.15 a share by Carta or anyone else.

(g) **The use-of-proceeds statements**. Mr. Manraj's January and March 2023 requests for money for "a new wave of hires" and for payroll, Pvotal's October 2023 statement that the Round 3 money was "primarily allocated for the hiring of 15 new staff and consultants", Pvotal's May 2024 request, through Mr. Stoller, for a wire so that "they can process payroll and other payments", and the May 2024 and March 2025 letters' statement that the money would "facilitate our operations, payroll, and expenses" each conveyed that Pvotal's capital was being spent on its operations. None disclosed that, from November 2021 on, Mr. Manraj was also using the Company's account for himself. He was then diverting that capital through the Questioned Payments and the American Express accounts, including the monthly $17,701.80 "Mckinsey" payments that began five days after Mr. Tourani paid the second installment the May 2024 letter requested and continued past the March 2025 letter, and, in 2026, through the Columbia Account.

(h) **The valuation statements**. The May 2024 and March 2025 letters each offered a "50% discount based on our latest company valuation," which conveyed that a valuation existed. On information and belief, none did apart

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

from figures Mr. Manraj entered in ledgers he maintained, which bore no relation to Pvotal's receipts from customers, and Mr. Manraj did not believe that Pvotal was worth the value implied. The same is true of his November 2024 statement that the "[l]ast Carta SPV is $12.85," of the $12.85 "current" value that Pvotal's November 2024 purchase agreement and certificates recited, and of his statement that Pvotal was worth $385 million. Mr. Manraj himself wrote, on November 13, 2024, that "[w]e haven't done a new evaluation yet." In 2026, Pvotal obtained an independent valuation of Infrastream which concluded that it was worth, at most, $200,000. Infrastream was Pvotal's primary enterprise product and Mr. Manraj represented to Mr. Tourani that it represented most of Pvotal's current and future revenue and potential revenue. Accordingly, the valuations provided by Mr. Manraj to Mr. Tourani were wildly over-inflated.

(i) **The 2023 and 2024 Google statements**. Pvotal's October 2023 statement, through Mr. Stoller, that it was "extremely busy with the new Google partnership", Mr. Manraj's October 2024 statements that InfraStream was launching with Google and was "finally ready to launch globally", and Pvotal's November 2024 statement that it had reissued its investors' shares "[a]t the request of Google Ventures," were, on information and belief, false. Pvotal did not have any actual or anticipated deal with Google at the time these statements were made, or, on information and belief, at any other time.

(j) **The Investor Document**. The Investor Document dated August 2025, contained false statements, including, without limitation: that Pvotal "has generated $4,106,023.47" since 2021, when Pvotal's operating account had received $1,637,163.63 from customers in its lifetime; that it was approved and signed by Elisabeth Beiter, who, on information and belief, did not review or sign the document; that the current estimated company value was $12.85 per share; and that the Columbia Bank account was established "to facilitate governmental contracts, payroll, and business transactions."

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

(k) **The Columbia instructions**. By directing that payments for Pvotal stock be made into an account titled "Pvotal Tech," which he described as Pvotal's account at "the Nevada branch of Columbia Bank," opened because Pvotal was moving to Nevada, Mr. Manraj represented that the money would belong to Pvotal and be used as its capital. He did not disclose that Pvotal was not moving to Nevada, that Pvotal's management could not see or access the account, or that the money would be forwarded to Pvotal as purported loans or paid to American Express.

127. Mr. Manraj made each statement attributed to him. He wrote and sent the emails, messages, and letters, signed the agreements as Pvotal's Chief Executive Officer, directed where payments were to be sent, and had ultimate authority over the content of each statement and over whether and how it was communicated. Pvotal made each statement made in its name or on its behalf, including the Purchase Agreements, the letters, the Investor Document, and the statements of its agent, Mr. Stoller.

128. Mr. Manraj and Pvotal also violated Rules 10b-5(a) and (c) by carrying out a scheme to defraud Mr. Tourani in connection with his purchases. From November 2021 on, Mr. Manraj ran Pvotal's operating business as a showroom for Mr. Tourani, raising each new payment on the strength of that business while using the Company's account for himself and Ms. Wilson. That conduct was itself deceptive, apart from any statement. As part of the same scheme, Mr. Manraj had Pvotal sign purchase agreements months after Mr. Tourani paid, under earlier printed dates; issued certificates reciting payment into the Chase Account for money he had sent to the Columbia Account; represented, in agreement after agreement, that Pvotal could issue many times the shares its charter authorized, and that 20,000,000 shares were outstanding when Pvotal's own lists showed more; directed Mr. Tourani's 2026 payments into the Columbia Account, from which they were forwarded to Pvotal under wire descriptions calling them loans or paid to American Express; caused the Investor Document to bear Ms. Beiter's signature; kept the Family Office paying with assurances that certified financial statements were on the way; and, when asked for financial records, produced altered ones.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

129. Mr. Manraj acted with scienter. He knew his statements were false and his conduct deceptive, or was at least deliberately reckless as to those facts. His scienter is imputed to Pvotal, whose Chief Executive Officer he was and on whose behalf he acted.

130. Mr. Tourani reasonably relied on Mr. Manraj's statements, on what Pvotal's agents told the Family Office, and on the integrity of the documents and payment instructions Mr. Manraj gave him, in making each purchase. Mr. Tourani was never provided with access to Pvotal's books and records until August 2026 and he was not able to independently verify the accuracy of the representations about Pvotal's finances and value that Mr. Manraj conveyed to him.

131. Each share purchase made by Mr. Tourani was a domestic transaction. Pvotal is a Delaware corporation. Its shares were sold by Pvotal, through Mr. Manraj as its Chief Executive Officer, from Oregon and later California. Mr. Tourani paid for them into accounts at banks in the United States and Pvotal recorded them on share records maintained in the United States.

132. The facts Mr. Manraj and Pvotal misrepresented and concealed caused Mr. Tourani's losses. When those facts came out in July and August 2026, as Pvotal failed to meet payroll and Mr. Manraj's records were found to have been altered, Pvotal collapsed, and the shares for which Mr. Tourani had paid $12,082,252 became, on information and belief, worthless. Mr. Tourani has been damaged in an amount to be proven at trial.

**SECOND COUNT**

**Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)**

(Against Defendant Manraj)

133. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

134. Pvotal sold Mr. Tourani its shares by means of the statements and the scheme alleged in the First Count, which were made and carried out in Pvotal's name. Pvotal violated Section 10(b) and Rule 10b-5.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

135. At all relevant times, Mr. Manraj controlled Pvotal. He was its Chief Executive Officer and the only person exercising the powers of its board, and he controlled its fundraising, its bank accounts, its share records, and every communication with Mr. Tourani about the Company's finances.

136. Mr. Manraj did not act in good faith, and he directly induced the acts constituting the violations. He is liable jointly and severally with, and to the same extent as, Pvotal.

**THIRD COUNT**

**Violation of the Corporate Securities Law of 1968,**

**Cal. Corp. Code §§ 25401, 25501, 25504, and 25504.1**

(Against Defendants Pvotal, Manraj, and Wilson)

137. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

138. Pvotal sold Mr. Tourani the shares he bought in Rounds 4 and 5, for which he paid $6,457,252 between May 2024 and August 2026 (the "California Purchases"). Each was offered and sold in California. Cal. Corp. Code § 25008. By its own account, Pvotal "moved to California in 2023." Its March 2025 letter to Mr. Tourani bore its Sacramento address, and the electronic audit trails of the November 2024, June 2025, and May 2026 purchase agreements show that Mr. Manraj signed each from Chico. On information and belief, Mr. Manraj made each offer from Chico, where he lived and where Pvotal had its principal place of business, and Pvotal accepted each of Mr. Tourani's purchases there, including through the five 2026 purchase agreements Mr. Manraj signed there.

139. In the alternative to the Fourth Count, the Round 3 purchase, for which Mr. Tourani paid $2,000,000 between November 2023 and February 2024, was also offered and sold in California and is also a California Purchase. Pvotal moved to California in 2023, and the Round 3 offer was made in October 2023. On information and belief, it was made from California.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

140. Pvotal offered and sold the California Purchases by means of written and oral communications that included untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Corporations Code section 25401. Those communications include the statements identified in paragraph 126(e) through (j), the assurances about certified records described in paragraph 61, and the omissions identified in paragraph 165.

141. Mr. Tourani did not know the facts concerning the untruths and omissions. Pvotal knew of them and cannot show that it exercised reasonable care: the statements were made by its Chief Executive Officer and its agents and concerned facts within Mr. Manraj's own knowledge and control.

142. Pvotal is liable to Mr. Tourani under Corporations Code section 25501. Mr. Tourani still owns the shares and tenders them to Pvotal by this Complaint. He is entitled to recover the $6,457,252 he paid in Rounds 4 and 5, and, if the Round 3 purchase is a California Purchase, the $2,000,000 he paid for it, plus interest at the legal rate, less the amount of any income received on the shares, of which there has been none, and to his reasonable attorney's fees and costs.

143. Mr. Manraj is jointly and severally liable with Pvotal, and to the same extent, under Corporations Code section 25504, because he directly and indirectly controlled Pvotal, was its principal executive officer and one of its directors, and knew the facts by reason of which Pvotal's liability exists. He is also jointly and severally liable under Corporations Code section 25504.1, because he materially assisted in Pvotal's violation of section 25401 with intent to deceive and defraud Mr. Tourani.

144. Ms. Wilson is jointly and severally liable with Pvotal, and to the same extent, under Corporations Code section 25504, because she was a director of Pvotal when each California Purchase was made. Pvotal's incorporator appointed her one of its three initial directors on June 2, 2021, to serve until a successor was elected and qualified. On information and belief, none ever was, and she has never resigned. Ms. Wilson knew, or had reasonable

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

grounds to believe, the facts by reason of which Pvotal is liable. She lives with Mr. Manraj and she holds a card on an American Express account that Pvotal's money paid, including, on information and belief, for work on the Chico Property she owns. On information and belief, she received $128,500 from Pvotal into account 7773, although she performed no services for Pvotal, and she held Pvotal stock herself. She benefited from the personal and household charges Pvotal paid, as alleged in paragraphs 99 through 101.

145. Any provision of the purchase agreements purporting to bind Mr. Tourani to waive compliance with the Corporate Securities Law of 1968 is void. Cal. Corp. Code § 25701.

**FOURTH COUNT**

**Violation of the Oregon Securities Law, Or. Rev. Stat. § 59.115**

(Against Defendants Pvotal and Manraj)

146. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

147. The Oregon Securities Law applies to a sale when the offer to sell originates from Oregon. Or. Rev. Stat. §§ 59.335(1), 59.345(1).

148. Pvotal and Mr. Manraj made the Round 2 offer, and on information and belief the Round 3 offer, from Oregon. On information and belief, in 2022, when the Round 2 offer was made, Mr. Manraj lived in Eagle Point, Oregon, and ran Pvotal from there, and Pvotal's bank statements went there through February 2024. The Round 3 agreement is dated October 4, 2023, before Ms. Wilson acquired the Chico Property.

149. Pvotal sold, and Mr. Manraj successfully solicited, Mr. Tourani's Round 2 and Round 3 purchases by means of untrue statements of material fact and omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and in violation of Or. Rev. Stat. § 59.115(1)(b) and § 59.135(2), and as part of a scheme and course of business in violation of § 59.135(1) and (3). Those statements include: Mr. Manraj's September 2022 statements that Pvotal had received an offer from Google and that investors were coming in at a $50 million valuation; Pvotal's 2023 statements that its shares were worth $11.50, $6.15 under a Carta 409A valuation, and

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

$10.29; Pvotal's October 2023 statement that it was "extremely busy with the new Google partnership"; Pvotal's statement that the Round 3 money was "primarily allocated for the hiring of 15 new staff and consultants"; and § 2.11.1's representation that there were no arrangements between Pvotal and its officers, made while Pvotal was paying money into an account from which Mr. Manraj's personal credit cards are paid, and into his own account outside its payroll system. Mr. Tourani did not know of the untruths or omissions.

150. Neither Pvotal nor Mr. Manraj can sustain the burden of proving that it or he did not know, and in the exercise of reasonable care could not have known, of the untruths and omissions. Mr. Manraj made or directed the statements, and the facts they misstated or omitted concerned his own conduct. Pvotal is liable as the seller under Or. Rev. Stat. § 59.115(1)(b). Mr. Manraj is liable under § 59.115(1)(b), because he successfully solicited the sales, and under § 59.115(3), jointly and severally with Pvotal, because he controlled Pvotal, was its officer, and participated and materially aided in the sales.

151. Mr. Tourani will tender the Round 2 and Round 3 shares before entry of judgment, as Or. Rev. Stat. § 59.115(5) permits, and seeks under Or. Rev. Stat. § 59.115(2)(a), from Pvotal and Mr. Manraj jointly and severally, the $4,500,000 he paid for them, with interest from the date of each payment at the rate specified in Or. Rev. Stat. § 82.010, less any amount received on the shares, together with reasonable attorney fees under Or. Rev. Stat. § 59.115(10).

**FIFTH COUNT**

**Intentional Misrepresentation (Cal. Civ. Code §§ 1709, 1710(1))**

(Against Defendants Manraj and Pvotal)

152. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

153. Mr. Manraj, for himself and as Pvotal's Chief Executive Officer, and Pvotal, through him and through its agent Mr. Stoller, represented to Mr. Tourani, directly and through the Family Office that: (a) Pvotal's technology was "[u]nbreachable," "fully compliant with all major standards," and operated in "ISO 27001, 27018, SOC 1-3, HITRUST environments";

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

(b) Google had made an offer for part of Pvotal's business and was in discussions to acquire it; (c) investors were coming into Pvotal at a $50 million valuation; (d) Pvotal's shares were worth $11.50, $6.15 under a Carta 409A valuation, $10.29, and $12.85, and Pvotal was worth $385 million; (e) Infrastream was launching with Google and was ready to launch globally, and Google Ventures had asked Pvotal to reissue its investors' shares; (f) Pvotal needed Mr. Tourani's money for its operations and payroll; (g) Pvotal had generated $4,106,023.47 since 2021, was authorized to issue the shares it sold him, and had 20,000,000 shares outstanding; (h) the Columbia Account was Pvotal's account, opened because Pvotal was moving to Nevada; and (i) Pvotal's financial statements and share records were being certified by its auditor and an independent lawyer.

154. Those representations were false. Mr. Manraj knew they were false when he made them, or made them recklessly, without knowing whether they were true.

155. Mr. Manraj and Pvotal made these representations to induce Mr. Tourani to pay for Pvotal shares, and Mr. Tourani reasonably relied on them in doing so.

156. As a direct and proximate result, Mr. Tourani has been damaged in an amount to be proven at trial.

157. Pvotal is liable for the fraud of its Chief Executive Officer and its agents, committed in selling its shares and for its benefit.

158. Mr. Manraj acted with fraud, oppression, and malice. Mr. Tourani is entitled to punitive damages under Civil Code section 3294 against Mr. Manraj, and against Pvotal, whose Chief Executive Officer committed the fraud.

**SIXTH COUNT**

**False Promise (Cal. Civ. Code §§ 1709, 1710(4))**

(Against Defendants Manraj and Pvotal)

159. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

160. Mr. Manraj, for himself and for Pvotal, promised Mr. Tourani a shareholder agreement and investor protections, a functioning board with control over the Company's

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

finances, a board seat, and the use of his money for Pvotal's operations at that board's direction. Mr. Manraj and Pvotal, through Mr. Stoller, also promised Mr. Tourani five million shares of each of Fulcrum Innovations Inc., Alea Gaming Services LLC, and X Cloud Technologies, at no additional cost. Neither Mr. Manraj nor Pvotal intended to perform those promises when they were made.

161. Mr. Manraj's actions demonstrate his intent. He began paying Company money into account 9006 the day after Mr. Tourani's first payment. He never called a board meeting, seated the five-member board the Purchase Agreements promised, or took any step toward a shareholder agreement. No shares of Alea Gaming Services LLC, X Cloud Technologies, or Fulcrum Innovations were ever issued to Mr. Tourani.

162. Mr. Manraj and Pvotal made these promises to induce Mr. Tourani to pay for Pvotal shares, and Mr. Tourani reasonably relied on them in doing so.

163. As a direct and proximate result, Mr. Tourani has been damaged in an amount to be proven at trial, and he is entitled to punitive damages under Civil Code section 3294.

**SEVENTH COUNT**

**Fraudulent Concealment (Cal. Civ. Code §§ 1709, 1710(3))**

(Against Defendants Manraj and Pvotal)

164. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

165. Mr. Manraj concealed from Mr. Tourani that, from November 2021 on, he was using Pvotal's account, and with it Mr. Tourani's money, for himself and Ms. Wilson while he raised money on the strength of the business; that he controlled Fulcrum Innovations, Pvotal's largest stockholder, and the 6,000,000 Pvotal shares it held; that Pvotal's charter authorized only 1,500,000 shares; that, on information and belief, Pvotal had received no offer from Google and no investor had paid a price near the valuations he quoted; that Pvotal's revenue from customers was a small fraction of what he reported; that Pvotal had no functioning board exercising oversight over Pvotal and over Mr. Manraj; that Mr. Manraj was unilaterally directing how investor money was spent; that he was causing Pvotal to pay money into his own

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

account outside its payroll system, into an account from which his personal credit cards are paid, and to payees whose nicknames did not identify them; that Pvotal's money was paying personal and household charges of Mr. Manraj and Ms. Wilson; that Pvotal was not moving to Nevada, and that investor money sent to the Columbia Account was being forwarded to Pvotal as purported loans or paid to American Express; and, in June and July 2026, that Pvotal could not meet payroll while investor money was going to American Express.

166. Mr. Manraj and Pvotal had a duty to disclose those facts. Mr. Manraj was Pvotal's Chief Executive Officer and its only acting director, soliciting investment from a stockholder who, from November 12, 2021, on, depended on him for information. He knew facts that Mr. Tourani did not know and could not reasonably have discovered. He actively concealed them. And he made partial statements about the Company's technology, its prospects, its value, its governance, its finances, and the use of investor money that were misleading without them.

167. Mr. Manraj concealed these facts intentionally, to keep Mr. Tourani investing. Had Mr. Tourani known them, he would not have made the payments he made after the concealment began.

168. As a direct and proximate result, Mr. Tourani has been damaged in an amount to be proven at trial, and he is entitled to punitive damages because Mr. Manraj is guilty of oppression, fraud, or malice.

**EIGHTH COUNT**

**Negligent Misrepresentation (Cal. Civ. Code § 1710(2))**

(Against Defendants Manraj and Pvotal, Pleaded in the Alternative)

169. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein, except the allegations that Mr. Manraj acted knowingly or with intent to defraud.

170. In the alternative to the Fifth Count, Mr. Manraj and Pvotal made the representations of fact alleged in that Count without any reasonable ground for believing them

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

true. As the person in control of Pvotal's bank accounts, payees, and share records, Mr. Manraj had every means of knowing the truth.

171. Mr. Manraj and Pvotal made those representations to induce Mr. Tourani to invest, Mr. Tourani justifiably relied on them, and he has been damaged as a result in an amount to be proven at trial.

**NINTH COUNT**

**Rescission and Restitution (Cal. Civ. Code §§ 1689(b)(1)–(4), 1691, 1692)**

(Against Defendants Pvotal and Manraj)

172. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

173. Mr. Tourani's consent to each purchase of Pvotal stock, and to each agreement under which he made it, was obtained through fraud by Pvotal, acting through its Chief Executive Officer and its agents. He is entitled to rescind each purchase and each agreement. Cal. Civ. Code § 1689(b)(1).

174. Mr. Tourani is also entitled to rescind because the consideration for his payments has failed, and the failure was caused by Pvotal. The shares Pvotal purported to sell him exceeded the shares its charter authorized and, on information and belief, are void. Cal. Civ. Code § 1689(b)(2), (3).

175. Mr. Tourani discovered the facts entitling him to rescind in August 2026, and he gives notice of rescission by this Complaint. He offers to restore to Pvotal the shares he received, upon Pvotal's restoring to him the money he paid. Cal. Civ. Code § 1691.

176. Upon rescission, Mr. Tourani is entitled to restitution of the $12,082,252 he paid, with interest, and to any consequential damages, without duplication. Cal. Civ. Code § 1692. Mr. Manraj, who took the payments made for Mr. Tourani's account in 2026 into the Columbia Account and diverted other money Mr. Tourani paid to accounts he controls, is jointly liable for restitution of what he received.

177. Independently of rescission, Pvotal and Mr. Manraj received the $206,000 paid for Mr. Tourani's account in June, July, and August 2026 for shares that were never issued.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

The consideration for that money has failed entirely, and Pvotal and Mr. Manraj owe it to Mr. Tourani as money had and received for his use. Cal. Civ. Code § 1689(b)(4). On information and belief, the same is true of all the money Mr. Tourani paid, because the shares Pvotal purported to issue for it are void.

178. Mr. Tourani lacks an adequate remedy at law. Pvotal has no operating funds; Mr. Manraj's ability to satisfy a judgment is unknown and, on information and belief, inadequate; and the money Mr. Tourani paid is held, in part, in specific accounts and property in the hands of Mr. Manraj and others. Mr. Tourani is entitled to restitution in equity of the specific money he paid and its traceable proceeds, as alleged in the Twelfth Count, and, in the alternative, to restitution in an amount to be proven at trial.

**TENTH COUNT**

**Receiving and Withholding Property Obtained by Theft**

**(Cal. Penal Code § 496(a), (c))**

(Against Defendant Manraj)

179. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

180. Mr. Manraj, for himself and through Pvotal, obtained Mr. Tourani's money in a manner constituting theft, by knowingly and designedly making false representations and false pretenses to induce Mr. Tourani to part with it. Cal. Penal Code §§ 484(a), 490a, 532. His intent to defraud at the time he obtained the money is shown by facts including the payments into account 9006 that began the day after Mr. Tourani's first payment, the agreements signed behind earlier dates, and the forwarding of Mr. Tourani's 2026 payments to Pvotal as purported loans.

181. Mr. Manraj then received, concealed, and withheld that money from Mr. Tourani, knowing how it had been obtained, including by taking his 2026 payments into the Columbia Account, paying $104,733.68 from that account to American Express, and sending $16,523.41 of it to Pvotal under Ms. Wilson's name to pay the American Express credit line,

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

and by diverting money Mr. Tourani had paid into the Chase Account to accounts Mr. Manraj controls, including account 9006.

182. Under Penal Code section 496(c), Mr. Tourani is entitled to three times his actual damages, costs of suit, and reasonable attorney's fees.

**ELEVENTH COUNT**

**Avoidance of Voidable Transfers**

**(Cal. Civ. Code §§ 3439.04, 3439.05, 3439.07)**

(Against All Defendants)

183. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

184. Mr. Tourani is a creditor of Mr. Manraj and of Pvotal. His claims against each, for fraud, rescission, restitution, and violation of the securities laws, began to arise in November 2021, when they began obtaining his money by fraud, and have continued to arise since. Cal. Civ. Code § 3439.01(b), (c).

185. On information and belief, Pvotal, at Mr. Manraj's direction, transferred money traceable to Mr. Tourani's payments to or for the benefit of Mr. Manraj, Ms. Wilson, and Does 2 through 20, including: (a) the Questioned Payments; (b) payments to American Express for personal and household charges of Mr. Manraj and Ms. Wilson, including the charges for work on the Chico Property and for Ms. Wilson's lawyers in her lawsuit about it; and (c) the payments that matched those charges to the penny.

186. On information and belief, Mr. Manraj transferred money and property traceable to Mr. Tourani's payments, or to the money Mr. Manraj took from Pvotal, to or for the benefit of Ms. Wilson and others, including: (a) the Columbia Account's payments to American Express, and the July 30, 2026 "MACY WILSON" wire to the Chase Account that paid an installment on the credit line; (b) money from Mr. Manraj's accounts, including, on information and belief, account 9006, used to acquire, improve, or maintain the Chico Property, title to which is held by Ms. Wilson, and any transfer or transmutation by which the

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

Chico Property, or any interest in it, came to be held by Ms. Wilson as her separate property; and (c) money deposited in the Capital One account Mr. Manraj holds jointly with Ms. Wilson.

187. Each transfer was made with actual intent to hinder, delay, or defraud Mr. Tourani. Cal. Civ. Code § 3439.04(a)(1). Mr. Manraj's intent in causing Pvotal's transfers is Pvotal's intent. The badges of fraud include: transfers to insiders, Mr. Manraj, Pvotal's Chief Executive Officer, and Ms. Wilson, who on information and belief is his spouse; Mr. Manraj's continued use and enjoyment of the property transferred, including the home he shares with Ms. Wilson; concealment of the transfers through payee nicknames, the Columbia Account, and altered statements from which Ms. Wilson's name was removed; Mr. Manraj's disappearance from communication; the absence of reasonably equivalent value; and, on information and belief, the transferors' insolvency at or shortly after the time of the transfers. *Id.* § 3439.04(b).

188. On information and belief, Pvotal was insolvent throughout. It never earned enough from customers to pay its expenses, depended on investor money, chiefly Mr. Tourani's, to operate, and was liable to Mr. Tourani for the money it had obtained from him by fraud in amounts exceeding its assets. On July 31, 2026, its operating account held $2,380.15. It owes its former employees more than $256,000.

189. In the alternative, each transfer was made without reasonably equivalent value at a time when, on information and belief, the transferor was insolvent or was about to incur debts beyond its ability to pay. *Id.* §§ 3439.04(a)(2), 3439.05.

190. Mr. Manraj, Ms. Wilson, and, on information and belief, Does 2 through 20 were the first transferees of these transfers or the persons for whose benefit they were made, and none took in good faith and for reasonably equivalent value.

191. This claim affects title to, and the right of possession of, specific real property: 2958 Chico Avenue, Chico, California. Mr. Tourani seeks to avoid the transfer of that property, or of interests in it, to Ms. Wilson to the extent necessary to satisfy his claims against Mr. Manraj and Pvotal.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

192. Mr. Tourani is entitled to avoidance of the transfers to the extent necessary to satisfy his claims, to an injunction against further disposition of the Chico Property and the other assets transferred, to the appointment of a receiver to take charge of them, to levy execution on them once he obtains judgment, to judgment for their value, and to any other relief the circumstances require. *Id.* §§ 3439.07, 3439.08(b). In the alternative, to the extent the Chico Property is community or quasi-community property, it is liable for Mr. Manraj's debts to Mr. Tourani whatever the form of title. Cal. Fam. Code § 910(a); *see also* Cal. Fam. Code § 63.

**TWELFTH COUNT**

**Constructive Trust and Equitable Lien (Cal. Civ. Code §§ 2223, 2224)**

(Against All Defendants)

193. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

194. One who gains a thing by fraud or other wrongful act, or who wrongfully detains it, is an involuntary trustee of it for the person who would otherwise have had it. Cal. Civ. Code §§ 2223, 2224.

195. Mr. Manraj and Pvotal gained Mr. Tourani's money by fraud, and Mr. Manraj, Ms. Wilson, and Does 1 through 20 wrongfully detain it and the property acquired with it. Each holds that money and property as an involuntary trustee for Mr. Tourani.

196. The money can be traced. Mr. Tourani's 2026 payments went into a single, identified account that, on information and belief, Mr. Manraj controls, and apart from a small opening balance and fee credits, they were the only money that account received in 2026. Money paid for Mr. Tourani's account supplied about 92 percent of the investor money, and about three-quarters of all the money, that entered the Chase Account.

197. Mr. Tourani is entitled to a constructive trust over: (a) the funds in the Columbia Account traceable to his payments, and all property into which they can be traced; (b) the balances of account 9006, of account 4721, of the accounts behind the "Mckinsey" and "William" payees, of account 7773, and of the account behind the "Regence" payee, if it is not

held by an insurance carrier, to the extent of the money traceable to his payments that each received; and (c) the Chico Property, to the extent money traceable to his payments was used to acquire, improve, or maintain it. Where his money has been commingled with other funds, used to pay down a debt, or used to improve property, he is entitled to an equitable lien in the amount traced.

198. Ms. Wilson holds title to the Chico Property and gave no value for the money used to improve it. On information and belief, she knew its source.

199. Mr. Tourani is also entitled, pending judgment, to an order preserving that property and restraining its transfer or encumbrance. Without it, the property is likely to be dissipated, and the equitable relief sought here would be meaningless.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

**THIRTEENTH COUNT**

**Accounting**

(Against Defendants Manraj and Pvotal)

200. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

201. Mr. Manraj solicited and took Mr. Tourani's money as Pvotal's Chief Executive Officer, for a specified purpose: the purchase of Pvotal shares to fund Pvotal's business. He controlled the accounts into which it was paid, directed Mr. Tourani's 2026 payments into the Columbia Account, which, on information and belief, he controls, and kept Pvotal's books and share records. That relationship requires an accounting.

202. The amount due to Mr. Tourani cannot be determined without one. Only Mr. Manraj knows who holds the accounts that received the Questioned Payments, how the American Express accounts were used, and the full disposition of the money in the Columbia Account, including its activity before January 2026 and after July 2026, and only he can say what Pvotal shares, if any, were issued for the $206,000 paid for Mr. Tourani's account in June, July, and August 2026.

203. Mr. Tourani is entitled to a full accounting, under oath, of every dollar paid for his account and its disposition, and to payment of any balance found due.

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

**FOURTEENTH COUNT**

**Declaratory Relief (28 U.S.C. § 2201)**

(Against Defendants Manraj and Pvotal)

204. Mr. Tourani incorporates by reference all preceding paragraphs as though fully set forth herein.

205. An actual controversy exists between Mr. Tourani, on one side, and Mr. Manraj and Pvotal, on the other, over the money paid for Mr. Tourani's account into the Columbia Account. Mr. Tourani paid that money for Pvotal stock. Mr. Manraj caused it to be forwarded to Pvotal under wire descriptions calling it a loan and described it to Pvotal's operating team as his own consulting income, lent to the Company. Those descriptions put Mr. Manraj, or an entity he controls, in a position to claim that Pvotal owes it the money, a claim that would compete with Mr. Tourani's own claims against Pvotal.

206. Mr. Tourani seeks a declaration that (a) the money paid for his account into the Columbia Account was his payment for Pvotal stock and never belonged to Mr. Manraj, Doe 1, or any entity Mr. Manraj controls; and (b) neither Mr. Manraj nor any entity Mr. Manraj controls is a creditor of Pvotal on account of any transfer of that money from the Columbia Account to Pvotal.

**V. PRAYER FOR RELIEF**

WHEREFORE, Mr. Tourani prays for judgment against defendants as follows:

***A. Provisional Relief***

1. A temporary restraining order and preliminary injunction:

(a) restraining Mr. Manraj and Ms. Wilson, and all persons acting in concert with them who receive actual notice of the order, from selling, transferring, or encumbering the Chico Property;

(b) restraining defendants and all persons acting in concert with them who receive actual notice of the order, including the banks that hold the accounts, from transferring or withdrawing funds from account 9006; from the Columbia Account; from the accounts behind the "Mckinsey" and "William" payees and

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

account 7773, once identified; from the account behind the "Regence" payee, if it is not held by an insurance carrier; and from any accounts of Mr. Manraj at Ally Bank and, jointly with Ms. Wilson, at Capital One; in each case up to the lesser of the amount traced into the account from Mr. Tourani's payments, directly or through Pvotal, and the account's lowest intermediate balance after the traced deposit;

(c) restraining Mr. Manraj from drawing on the American Express credit line carried in Pvotal's name; from causing Pvotal to pay, secure, or acknowledge any purported loan from "Pvotal Tech," Doe 1, or any entity he controls; from altering Pvotal's stock ledger or issuing Pvotal shares; and from transferring or encumbering Pvotal's source code or other intellectual property, in each case without leave of Court;

(d) requiring that any recovery in *Wilson v. Fadale*, No. 25CV00584 (Butte Cnty. Super. Ct.), to the extent it reimburses costs paid with money traceable to Mr. Tourani's payments, be held in a segregated account pending further order; and

(e) requiring all parties to preserve all documents and electronically stored information relating to the matters alleged in this Complaint;

2. An order requiring Mr. Manraj to identify, under oath and within seven days, every account, in the United States or elsewhere, that has received money traceable to Pvotal or to Mr. Tourani since June 2021, with the holder and current balance of each; the holders of the Columbia Account and of the accounts ending 9006, 6852, 2645, 1771, and 7773; and the recipient of the $24,178.93 drawn on the American Express credit line on October 23, 2025;

3. An order permitting expedited, particularized discovery pursuant to Fed. R. Civ. P. 26(d)(1) from JPMorgan Chase Bank, N.A., Columbia Bank, Bank of America, Ally Bank, Capital One, American Express, the title and escrow companies for the Chico Property, the contractors and designers on its rebuild, and the providers of Pvotal's electronic-signature, capitalization, payroll, and cloud services;

4. The appointment of a receiver under Federal Rule of Civil Procedure 66 and Civil Code section 3439.07(a)(3)(B) to take charge of the Columbia Account and the other assets transferred;

5. If necessary to preserve Pvotal's remaining assets pending judgment, the appointment of a receiver or custodian of Pvotal's bank accounts, books and records, and intellectual property under Federal Rule of Civil Procedure 66 and the Court's equitable powers;

***B. Rescission, Restitution, and Damages***

6. Rescission of each of Mr. Tourani's purchases of Pvotal stock, and restitution from Pvotal and Mr. Manraj of the $12,082,252 he paid, with interest, upon his tender of the shares;

7. In the alternative, compensatory damages in an amount to be proven at trial, measured by the $12,082,252 Mr. Tourani paid, with interest, less the value, if any, of what he received;

8. Upon tender at or before judgment, recovery under Corporations Code sections 25501 and 25504 from Pvotal, Mr. Manraj, and Ms. Wilson, jointly and severally, of the $6,457,252 Mr. Tourani paid in Rounds 4 and 5, and, in the alternative to recovery under Oregon law, of the $2,000,000 he paid in Round 3, plus interest at the legal rate;

9. Upon tender at or before judgment, recovery under Oregon Revised Statutes section 59.115(2)(a) from Pvotal and Mr. Manraj, jointly and severally, of the $4,500,000 Mr. Tourani paid in Rounds 2 and 3, with interest from the date of each payment;

10. Treble damages against Mr. Manraj under Penal Code section 496(c);

***C. Equitable and Declaratory Relief***

11. Avoidance of the voidable transfers, including as to the Chico Property, to the extent necessary to satisfy Mr. Tourani's claims, and judgment against the transferees for the value of the assets transferred;

12. A constructive trust and equitable lien in Mr. Tourani's favor over the money paid for his account and its traceable proceeds, including the funds in the Columbia Account,

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

GRELLAS SHAH LLP
550 CALIFORNIA STREET, SUITE 1040
SAN FRANCISCO, CA 94104

the accounts that received the Questioned Payments, and the Chico Property, to the extent alleged in the Twelfth Count;

13. A full accounting, under oath, as requested in the Thirteenth Count;

14. The declarations requested in the Fourteenth Count;

***D. On All Claims***

15. Punitive damages on the claims for which they are available;

16. Reasonable attorney's fees and costs, including under Corporations Code section 25501, Oregon Revised Statutes section 59.115(10), and Penal Code section 496(c);

17. Prejudgment and post-judgment interest; and

18. Such other relief as the Court deems just.

Dated: November 9, 2026

**GRELLAS SHAH LLP**

By: <u>*/s/ Dhaivat H. Shah*</u>

Dhaivat H. Shah
Attorneys for Plaintiff
Mahesh Tourani

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b), Mr. Tourani demands a trial by jury on all claims and issues so triable.

Dated: November 9, 2026

**GRELLAS SHAH LLP**

By: <u>*/s/ Dhaivat H. Shah*</u>

Dhaivat Shah
Attorneys for Plaintiff
Mahesh Tourani